# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

| | |
|---|---|
| EUNIDE BENJAMIN and<br>JOSEPH BENJAMIN,<br><br>    Plaintiffs,<br><br>vs.<br><br>BAC HOME LOANS SERVICING, LP,<br><br>    Defendant. | CV 211-101 |

## ORDER

Presently before the Court is Defendant Bank of America, N.A.'s[1] Motion to Dismiss. Dkt. No. 10. For the reasons stated below, the Defendant's Motion to Dismiss is **DENIED**.

## BACKGROUND[2]

Eunide and Joseph Benjamin ("Plaintiffs") purchased a home at 118 Wentle Circle, Brunswick, Georgia on July 18, 2006. Plaintiffs financed the purchase of the home through two

---

[1] BAC Home Loans Servicing, LP, the named defendant in this case, has merged with Bank of America N.A. As such, Bank of America is the defending party.

[2] For the purposes of ruling on Defendant's Motion to Dismiss, the Court takes Plaintiffs' version of the facts as true. Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1057 (11th Cir. 2007) ("when ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true.").

1

AO 72A
(Rev. 8/82)

promissory notes ("Countrywide Notes") issued by Countrywide Home Loans, Inc. ("Countrywide"). The first note was for $202,800 with an interest rate of 8.375%; the second note was for $50,700 with an interest rate of 12.375%. Pls.' Compl. Exs. B, C, Dkt. No. 1. Although Plaintiffs were not content with their dealings with Countrywide or the terms of the Countrywide Notes, they agreed to the terms and moved into the home. Compl. ¶¶ 11-18.

A few months after closing on the home, Plaintiffs began experiencing financial troubles. Plaintiffs made efforts to find employment that would allow them to comfortably make the monthly payments on the Countrywide Notes, but had little success. According to Plaintiffs, they made multiple attempts to contact Countrywide to refinance or modify the notes, but Countrywide refused. On June 26, 2007, approximately a year after purchasing the home, Plaintiffs listed the home for sale.

In July, 2007, a month after listing the home for sale, Plaintiffs decided that they could not sell the home, and decided to offer the home for rent. Plaintiffs moved to Massachusetts, hoping to find better employment opportunities. While in Massachusetts, Plaintiffs fared better, and claim that they were able to make the required monthly payments on the Brunswick home. During this time, Plaintiffs continued to seek refinancing or modification through Countrywide.

AO 72A
(Rev. 8/82)

On August 7, 2007, Countrywide sent Plaintiffs a letter indicating that Plaintiffs' were in default on their mortgage, and suggesting that Plaintiffs might qualify for assistance. Compl. Ex. D. Plaintiffs do not claim to have responded to the August 7, 2007 letter. Several months later, on October 10, 2007, Plaintiffs received a letter from Countrywide stating that Plaintiffs might qualify for a refinancing loan with lower interest rates than their current loans. Compl. Ex. E.

Plaintiffs called Countrywide on November 15, 2007 and Countrywide said they were "working on Plaintiffs' loan modification" but that Plaintiffs needed to make a lump sum payment of $6,964.19.[3] Plaintiffs were unable to make the lump sum payment, and when negotiations with Countrywide broke down, Plaintiffs asked Countrywide to take possession of the home. Countrywide refused to take possession of the home, and indicated that it preferred to pursue loan modification options.

On December 17, 2007, Countrywide told Plaintiffs that a modification had been approved. Plaintiffs provide no information about the terms or specifics of this modification. Plaintiffs claim that between December 2007 and July 2008 they

---

[3] The Court notes the inconsistency in Plaintiffs' version of the facts. Plaintiffs' claim that upon moving to Massachusetts they were "able to make the loan payment." Compl. ¶ 27. However, Plaintiffs state that Countrywide contacted Plaintiffs regarding their default and that Countrywide required a payment of $6,964.19 in order for the modification to go forward. Compl. ¶¶ 28, 30.

attempted to get "caught up" on the loans by making $2,500 payments monthly.

In July 2008, the tenants in the Brunswick home moved out, jeopardizing Plaintiffs' ability to make the required monthly loan payments. On November, 26, 2008, Countrywide sent Plaintiffs a letter explaining that Countrywide could not provide any assistance with Plaintiffs' loan obligations. Compl. Ex. F. The letter referred Plaintiffs to the Countrywide Home Loan Division Loan Servicing Department for further inquiries. Plaintiffs' indicate that the reason Countrywide would not modify the loans was because the home was not being used as a primary residence.

At some point, Plaintiffs discovered that their loan had been transferred to BAC Home Loans Servicing, LP ("BAC").[4] On June 1, 2009, Plaintiffs provided BAC with a letter of hardship. BAC advised Plaintiffs that they would modify Plaintiffs' notes if they moved back into the Brunswick home. Plaintiffs moved back to the Brunswick home in September of 2009.

On August 27, 2009, Countrywide sent Plaintiffs two letters ("Modification Letters"), stating that Plaintiffs' modifications had been approved. The first letter stated that BAC had approved modification of Plaintiffs' first Countrywide note, the

---

[4] BAC has since merged with Bank of America, N.A. Def.'s Mot. Dismiss, Dkt. No. 10. For sake of simplicity, the Court refers to BAC and Bank of America N.A. as BAC throughout this Order.

4

$202,800 note. Compl. Ex. H. That letter stated that Plaintiffs' new monthly payment would be $1,762.41. The second letter referred to modification of Plaintiffs' second note, the $50,700 note. Compl. Ex. I. The second letter stated that the Plaintiffs' new monthly payment would be $831.71. Therefore, Plaintiffs' new combined monthly mortgage payment for the Brunswick home was $2,594.12 per month.

Soon thereafter, BAC sent Plaintiffs a form titled: Home Affordable Modification Trial Period Plan (Customer Copy) ("TPP"). Compl. Ex. J. The first paragraph of the TPP states, in relevant part:

> If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.[5]

The TPP went on to explain that the Plaintiffs needed to provide BAC with documentation of the hardship, if Plaintiffs had not already done so. The document also stated that the TPP would not take effect until both BAC and the Plaintiffs signed the TPP.

---

[5] The TPP is intended to be signed by the borrower and returned to BAC. Therefore, the TPP is written in the first person from the borrower's point of view.

5

The TPP stated that the trial period's effective date was November 1, 2009, and set forth a payment plan, consisting of three monthly payments of $1,033.33, due November 1, 2009, December 1, 2009, and January 1, 2010. The TPP further stated that the $1,033.33 monthly payment was an estimate of the payment that would be required under the modified loan terms, once the modification was finalized.

Importantly, the TPP included a series of paragraphs intended to show that the borrower understood certain aspects of the Plan. Chief among them, paragraphs F & G:

> F. If prior to the Modification Effective Date, (i) the Servicer does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the Servicer determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Plan will terminate. In this event, the Servicer will have all of the rights and remedies provided by the Loan Documents, and any payment I make under this Plan shall be applied to amounts I owe under the Loan Documents and shall not be refunded to me; and
>
> G. I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed. I further understand and agree that the Servicer will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Plan.

AO 72A
(Rev. 8/82)

Plaintiffs claim that they were confused by the amounts described in the TPP. Just a short time before receiving the TPP, the Plaintiffs had received the two loan modification letters indicating that their total monthly payment on the loans would be $2,594.12 per month. The $1,033.33 monthly payment in the TPP seemed at odds with the earlier modification letters. Despite their confusion, Plaintiffs made the $1,033.33 payments via automatic debit from Plaintiffs' checking account. Plaintiffs claim that BAC accepted the payments. Plaintiffs do not claim that they received a fully executed copy of the TPP from BAC.

On January 6, 2010, Plaintiffs called BAC regarding the mortgage and were told "everything was OK." Compl. ¶ 52. Three weeks later, on January 20, 2010, Plaintiffs received a letter from BAC. The letter stated that BAC had not received all of Plaintiffs' TPP payments, and that Plaintiffs needed to submit additional documents, namely, federal income tax returns and recent pay stubs. Compl. Ex. K. The letter stated that unless BAC received the required payments and financial documents, the borrowers were "at risk of losing [their] eligibility for a permanent Home Modification under the program." Id. Plaintiffs claim they sent the required documents.

Plaintiffs continued making automatic payments pursuant to the TPP after the January 20, 2010 letter. In April of 2010,

BAC failed to debit Plaintiffs' account for the monthly payment. BAC provided no explanation to Plaintiffs about why the payment was not debited. Plaintiffs claim "BAC's failure to debit Plaintiffs' account was deliberate, thus causing Plaintiffs to default on the trial modification plan." Dkt. No. ¶ 55.

On May 21, 2010, BAC sent Plaintiffs another letter addressing their compliance with the terms of the TPP. Compl. Ex. L. The letter stated that Plaintiffs' loan was ineligible for a Home Affordable Modification "because [the borrower] did not make all of the required Trial Period Plan payments by the end of the trial period." Id. The letter does not indicate that BAC would reconsider Plaintiffs for the Home Affordable Modification Program. Rather, the letter states that BAC was considering whether Plaintiffs might have qualified for other assistance options.

In June or July 2010, Plaintiffs engaged the services of a financial counselor. The financial counselor conducted a conference call with BAC and one of the Plaintiffs. During the call, BAC stated that it could not offer further assistance to Plaintiffs. Following the conference call, Plaintiffs engaged legal counsel to assist with loan modification.

On December 6, 2010, BAC told Plaintiffs' counsel that Plaintiffs qualified for a home retention program and that BAC

would mail a package of documents to Plaintiffs. Plaintiffs never received the package of documents.

On December 31, 2010, BAC sent a letter to Plaintiffs stating that the Plaintiffs' loan was in foreclosure. Compl. Ex. N. The letter stated that Plaintiffs needed to pay $60,179.45 to reinstate the loan.

On April 29, 2011 Plaintiffs filed this suit in the Superior Court of Glynn County, Georgia. Dkt. No. 1. The suit was removed to federal court by Defendants on June 24, 2011. Id. Defendants now move to dismiss Plaintiffs' Complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).

**LEGAL STANDARD**

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this pleading standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In order to withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A complaint is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

It is important to note that while the factual allegations set forth in the complaint are to be considered true at the motion to dismiss stage, the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 129 S.Ct. at 1949). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 129 S.Ct. at 1949. The court does not need to "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.

Lastly, the Court notes that exhibits attached to pleadings become part of a pleading. Fed. R. Civ. P. 10(c). Consequently, a court may consider documents attached to a complaint as exhibits in resolving a motion to dismiss without converting the motion to one for summary judgment. Taylor v. Appleton, 30 F.3d 1365, 1368 n.3 (11th Cir. 1994).

**DISCUSSION**

In their Complaint, Plaintiffs assert five state-law theories of recovery: Breach of Contract; Breach of the Covenant of Good Faith and Fair Dealing; Promissory Estoppel; Fraud; and Negligent Misrepresentation. Defendant argues that each count should be dismissed for failure to state a claim upon which relief may be granted.

**I. Breach of Contract**

Plaintiffs' breach of contract theory is that the TPP obligated BAC to accept a lower monthly payment on Plaintiffs' loans.[6] Defendant argues that the TPP was not a binding contract to modify Plaintiffs' mortgage. Specifically, Defendant argues that the TPP constituted "an offer to consider Plaintiffs' application for a loan modification, not an outright offer to modify Plaintiffs' mortgage." Def.'s Mot. Dismiss 11-12, Dkt. No. 10. Although the TPP contains conditional language, the

---

[6] There is some ambiguity in Plaintiffs' Complaint, but it is inescapable that Plaintiffs are referring to the TPP as the binding agreement. The Court reaches this conclusion based on a comprehensive reading of Count I. In Count I, Plaintiffs state that "Defendant breached the Agreement by demanding that Plaintiffs make payments in excess of the terms of the Agreement." Compl. ¶ 66. The Court can find no indication in the Complaint or the briefing that Plaintiffs were ever asked to pay more than the $2,594.12 monthly payment established by the August 27, 2009 Loan Modification. The Court can only assume that Plaintiffs refer to demands by Defendant to pay the full $2,594.12 payment, compared to the $1,033.33 monthly payment described in the TPP. Accordingly, the Court understands the word "Agreement" in Count I as referring to the TPP. The Court notes that Defendant adopts a similar reading of Plaintiffs' Count I, given that Defendant devotes a significant portion of its motion to arguing that the TPP did not constitute an enforceable contract.

11

Court cannot say that a breach of contract claim based on the TPP is implausible.

The TPP explicitly states that loan modification will not occur, and the Plan will terminate, if "the Servicer does not provide [the borrower] a fully executed copy of this Plan and the Modification Agreement." Compl. Ex. J, § 2, ¶ F. The plain terms of the TPP established two conditions precedent to a contract for permanent loan modification. If those conditions were met, BAC could plausibly be held liable for obligations arising under the TPP. Accordingly, Plaintiffs have set forth a cognizable claim for breach of contract arising from the TPP. BAC's Motion to Dismiss is denied with regards to the Plaintiffs' breach of contract claim.

## II. Breach of the Covenant of Good Faith and Fair Dealing

Plaintiffs' Count II claims that Defendant breached a covenant of good faith and fair dealing. The only two factual paragraphs in Plaintiffs' Count II are that (1) Defendant failed to respond to Plaintiffs' requests for information on their loan modification, and (2) Defendant failed to comply with the loan modification. Compl. ¶¶ 71, 72.

There is no independent cause of action for breach of the covenant of good faith and fair dealing under Georgia law.[7] Stuart Enters. Intern., Inc. v. Peykan, Inc., 555 S.E.2d 881, 883-84 (Ga. Ct. App. 2001). Construing Plaintiffs' Complaint broadly, Plaintiffs' Count II is more accurately a second breach of contract claim, based not on the express terms of an agreement between the parties, but on an implied covenant of good faith and fair dealing. Plaintiffs' Count II sets forth a plausible breach of contract claim. Assuming that Plaintiffs are able to establish a binding contract, they set forth a plausible claim that BAC breached the contract's implied covenant of good faith and fair dealing. BAC's motion to dismiss Plaintiffs' Complaint with regards Count II, claiming a breach of contract based on breach of the implied covenant of good faith and fair dealing, is denied.

## III. Promissory Estoppel

Plaintiffs' Count III asserts a claim for promissory estoppel. Plaintiffs' claim of promissory estoppel is based exclusively on representations made in the TPP. Plaintiffs

---

[7] Plaintiffs appear to agree that no independent cause of action for breach of the covenant of good faith and fair dealing exists under Georgia law. See Pls.' Reply 6, Dkt. No. 16 (citing Defendant's authority for the same proposition). Consequently, to the extent that Plaintiffs are attempting to claim a breach of an implied duty of good faith and fair dealing completely independent of a binding contract, that claim is dismissed. On the other hand, a breach of contract claim premised on a breach of the implied duty survives this Order.

13

argue that the TPP promised that if Plaintiffs submitted the required documentation and payments described in the TPP, then BAC would modify Plaintiffs' mortgage. Compl. ¶ 76.

To set forth a claim for promissory estoppel a plaintiff must allege: (1) the defendant made a promise; (2) the defendant should have expected the plaintiff to rely on the promise; (3) the plaintiff reasonably relied on such promise to his detriment; and (4) an injustice can only be avoided by the enforcement of the promise, because as a result of the reliance, plaintiffs changed their position to their detriment. O.C.G.A. § 13-3-44(a); Everts v. Century Supply Corp., 590 S.E.2d 199, 202 (Ga. Ct. App. 2003).

Plaintiffs' promissory estoppel claim is based on the premise that the TPP makes promises upon which the Plaintiffs' relied. Plaintiffs have pled factual content sufficient to establish a short plain statement of their claim for relief. See DPLM, Ltd. v. J.H. Harvey Co., 526 S.E.2d 409, 412 (Ga. Ct. App. 1999) (noting that "[p]romissory estoppel claims are extremely fact specific and are not susceptible to application of general rules"). BAC's motion to dismiss Plaintiffs' promissory estoppel claim is denied.

14

### IV. Fraud and Negligent Misrepresentation

In Count IV of their Complaint, Plaintiffs allege both fraud and negligent misrepresentation on the part of BAC. The causes of action are distinct, and the Court analyzes each separately.

#### A. Fraud

Plaintiff's fraud claim is based on the TPP and comments made by BAC employees. Plaintiffs claim that BAC made fraudulent representations that Plaintiffs' mortgage would be modified if they submitted certain documents and made all the required TPP payments. Compl. ¶ 83.

The elements of fraud are: "(1) false representation by a defendant; (2) scienter; (3) intention to induce the plaintiff to act or refrain from acting in reliance upon the representation; (4) justifiable reliance by the plaintiff upon the representation; and (5) damage to the plaintiff directly and proximately caused by the reliance." TSG Water Res., Inc. v. D'Alba & Donovan Certified Pub. Accountants, P.C., 260 F. App'x 191, 199 (11th Cir. 2007) (citing Middleton v. Troy Young Realty, Inc., 572 S.E.2d 334, 336 (Ga. Ct. App. 2002)). "While fraud cannot generally be based on instances of misrepresentations as to future events, it may consist of such instances if, when the misrepresentation is made, [the promisor] knows that the future event will not take place." Howard v.

15

Hammond, 455 S.E.2d 390, 393 (Ga. Ct. App. 1995) (quoting Hayes v. Hallmark Apts., Inc., 207 S.E.2d 197, 199 (Ga. 1974)).

Plaintiffs refer to various representations made by BAC, including statements in the TPP and two verbal communications: (1) "On January 6, 2010, the Plaintiffs called BAC and were told that 'everything was OK,'" and (2) "On December 6, 2010, . . . Plaintiffs' counsel was told that the Plaintiffs did indeed qualify for a home retention program" and that a package of documents would be mailed to Plaintiffs. Compl. ¶¶ 52, 59. Consequently, Plaintiffs fraud claim is based on representations in the TPP, the January 6, 2010 statements, and the December 6, 2010 statements.

Plaintiffs' have pointed to specific representations which they claim were false. Plaintiffs further claim that BAC made those representations willfully. Compl. ¶ 88. Plaintiffs claim to have relied on those representations in paying a reduced monthly amount for several months, and then ultimately being in arrears for substantial sums. Plaintiffs' Complaint clearly puts BAC on notice of the specific representations Plaintiffs claim were fraudulent. Therefore, Plaintiffs have adequately set forth a claim for fraud. Defendants' motion to dismiss Plaintiffs' fraud claim is denied.

AO 72A
(Rev. 8/82)

### B. Negligent Misrepresentation

Plaintiffs also claim negligent misrepresentation in Count IV. The factual bases of the negligent misrepresentation claim are the same as the bases for the fraud claim: representations in the TPP, the January 6, 2010 statements, and the December 6, 2010 statements.

The required elements of a claim of negligent misrepresentation are: "(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc., 479 S.E.2d 727, 729 (Ga. 1997).

Plaintiffs have sufficiently pled a claim for negligent misrepresentation. Plaintiffs have identified specific representations by BAC. Plaintiffs have pled factual support for their reliance and subsequent injury. Plaintiffs have therefore set forth a plausible claim for negligent misrepresentation. Defendants' motion to dismiss Plaintiffs' negligent misrepresentation claim is denied.

## CONCLUSION

The Court concludes that Plaintiffs' Complaint sufficiently pleads claims for breach of contract, promissory estoppel,

17

fraud, and negligent misrepresentation.  Plaintiffs' Complaint satisfies the minimum pleading standards required under the Federal Rules of Civil Procedure.  For those reasons, Defendant's Motion to Dismiss Plaintiff's Complaint is **DENIED**.  In doing so, the Court in no way forecloses review of each cause of action at the summary judgment stage.

   **SO ORDERED**, this 29th day of March, 2012.

_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA